UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

STEVEN J. OSTERMAN,

        Plaintiff,

v.                                                     Case No. 17-C-517

JOHN KIES, et al.,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Steven Osterman, who is currently representing himself, filed this 42 U.S.C. § 1983 action against defendants John Kies, Andrew Wesner, and Nathan Beier on April 10, 2017. Osterman claims Defendants were deliberately indifferent to his special accommodations for urinalysis testing due to his diagnosis of paruresis, or shy bladder syndrome. Presently before the court is Defendants' motion for summary judgment. For the following reasons, the motion will be granted and the case will be dismissed.

## BACKGROUND

Osterman was housed at Redgranite Correctional Institution at all times relevant to this action. Defs.' Proposed Findings of Fact (DPFOF) ¶ 1, ECF No. 22. Osterman has suffered from paruresis, or shy bladder syndrome, since the 1970s and was officially diagnosed with paruresis in the early 2000s. Paruresis is a social phobia that causes great difficulty urinating in the presence of others. Osterman's paruresis causes him "great anxiety" when attempting to urinate in front of other individuals. Osterman has also been diagnosed with chronic coronary artery disease and has had five heart surgeries. Physicians determined the "increased emotional stress associated with his

long-standing history of 'bashful bladder'" contributed to his hypertension and anginal symptoms and is likely to contribute to his cardiac risk. ECF No. 33-1 at 5. Osterman takes nitroglycerin to treat his heart condition.

Based on his paruresis diagnosis, Osterman has received special accommodations during urinalysis testing at the various institutions he has been housed. Once Osterman was transferred to Redgranite in 2012, he requested that the institution provide him with special accommodations during urinalysis testing, which was conducted in the housing unit's public bathroom. Deputy Warden Eckstein granted his request on December 4, 2012 and provided the following accommodation:

> I have received a request for special accommodation for the U/A collection process. I have reviewed this request with Mr. Schueler, Security Director. You will be provided additional time to provide a urine sample. Once you have been identified to provide a sample you will be required to sit on the bench near the sergeant's station after the closing of dayrooms. You will be offered fluids consistent with present policy. An officer will accompany you to the bathroom where you will be strip searched. You will be permitted to use the last bathroom stall—with the door closed—in order to produce a urine sample. The officer will stand outside the stall while you produce the urine sample.

ECF No. 24-1 at 1.

In 2013, Redgranite began conducting urinalysis testing in the intake area. DPFOF ¶ 14. The intake bathroom is small and private. It is surrounded on all sides by solid, opaque walls and contains a metal door with only a small, narrow window. *Id.* ¶ 19. When Osterman learned that the testing location had changed, he submitted a psychological service request (PSR) on July 14, 2013, requesting that his special accommodations "be changed in order to alleviate any problems regarding [his] paruresis." ECF No. 24-1 at 2. Osterman sent a second request on August 5, 2013 because he had "not received any word or paperwork regarding 'special accommodations' for the

paruresis dealing with UAs." *Id.* at 3. On August 6, 2013, Dr. Fleck sent Osterman a memo which stated,

> I spoke to Lt. Wesner regarding your concerns about providing UA samples. Lt. Wesner confirmed that you will continue to receive accommodations, which will involve you being granted privacy when providing UA samples.
>
> When you are called to provide UA samples, please bring the relevant paperwork that indicates you have been granted accommodations.

*Id.* at 4. This memo did not define "privacy" or note any accommodations specific to the new urinalysis testing location.

Osterman was first selected for testing at Redgranite on June 29, 2016. He reported to the testing site with an envelope containing the December 4, 2012 memo from Warden Eckstein; his July 14, 2013 PSR; his August 5, 2013 PSR; and the August 6, 2013 memo from Dr. Fleck. DPFOF ¶ 24. Officer Kies reviewed the accommodation paperwork and observed that the December 2012 accommodations were inapplicable to the testing conditions in intake. Without conferring with Officer Kies, Officer Benbo escorted Osterman to the intake bathroom and closed the door. After Osterman provided a sample, Kies asked for Osterman's accommodation paperwork so he could review it with his supervisor and told Osterman he would be contacted if there was a problem with the accommodations. Kies claims that a supervisor advised him that it was no longer necessary to follow the accommodation paperwork because the testing location had changed and the accommodations paperwork appeared to be outdated. After meeting with this supervisor, Kies returned the paperwork to Osterman. *Id.* ¶¶ 33–34.

Osterman was again selected for testing with Officer Kies on August 17, 2016. Osterman arrived at intake with the envelope that contained his accommodation paperwork and said, "I'm

3

Osterman, the one with special accommodations for privacy for urine samples." *Id.* ¶ 37. Kies did not take the documents out of the envelope or review them because he believed the envelope contained the same accommodation paperwork he read on June 29, 2016. Osterman does not dispute that the information in the envelope had not changed.

After setting the envelope on a chair, Kies placed Osterman in the intake area's holding cell and asked if he was ready to provide a sample. Osterman responded that he would try. *Id.* ¶ 43. Kies escorted Osterman to the bathroom and partially closed the door, leaving the door cracked two to three inches. Osterman was unable to provide a sample because he could see Kies watching him through the crack in the door. Kies then placed Osterman back in the holding cell. Approximately ten minutes later, Kies asked if Osterman would like to try again. Osterman told him that he would try to provide a sample but needed privacy. Kies advised Osterman that he would no longer receive accommodations or privacy, refused Osterman's requests to see a supervisor and the head of psychology, and walked away.

Once Kies left, Osterman began experiencing chest pains. He immediately reported his chest pains to Officer Rodensal, who relayed Osterman's complaints to Kies. Less than one minute later, Kies handed Osterman a telephone so that he could describe his medical needs to Nurse Klenke. Nurse Klenke arrived at intake within two or three minutes. She checked Osterman's vitals, gave him two doses of nitroglycerin, and returned to the health services unit. Rodensal informed Osterman that a supervisor had been called. Shortly thereafter, Lieutenant Beier arrived at intake, and Osterman complained that Kies was not providing him with privacy accommodations. When Beier asked what type of accommodations Osterman sought, Osterman suggested that he be allowed to go to the strip search cage, "get stripped out, give me a cup, and get out of the room."

4

*Id.* ¶ 64. Beier, Kies, and Rodensal left Osterman in the holding cell to discuss a resolution. Beier contacted Captain Wesner, who directed Beier to give Osterman privacy by closing the door and monitoring him from outside the bathroom. Five minutes later, Beier returned to the holding cell and explained that they could not accommodate Osterman as he had requested because it would be unsanitary for him to provide a sample in the strip search cage. Instead, Beier stated that they would allow him to go into the bathroom, close the door completely, and have an officer monitor him only from above the neck. He directed Osterman to stand so that his back is against the door when he provides the sample. Osterman agreed to these modifications and provided a urine sample.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of proving that summary judgment should be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 933, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

**ANALYSIS**

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by an inmate that he has not received adequate medical treatment states a violation of the Eighth Amendment. An inmate's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that claim." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). For the purposes of summary judgment, Defendants concede that paruresis is an objectively serious medical condition. As a result, the court will address whether Defendants were deliberately indifferent.

Deliberate indifference requires more than negligence or even gross negligence; it requires that the defendants knew of, yet disregarded, an excessive risk to Osterman's health or safety. *Farmer*, 511 U.S. at 835, 837; *see also Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) ("A state officer is deliberately indifferent if he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred."). It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). The plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Kies asserts that he was not deliberately indifferent to Osterman's serious medical needs because he did not know about them. Although the accommodation paperwork indicated that Osterman had paruresis, Kies did not know that this condition caused anxiety and aggravated Osterman's heart condition. Osterman does not dispute that he never told Kies that there may be a correlation between his anxiety during urinalysis and his heart complications. Nevertheless, Osterman asserts that his paruresis has been documented by the Department of Corrections since 2005 and that medical and clinical staff knew about his condition. It is not enough to show that Osterman had a serious medical condition and that some Redgranite staff members knew about it, however. Rather, Osterman must demonstrate that *these specific officers* knew of the condition and disregarded it. Even though Osterman received special accommodations for paruresis, there is no evidence in this record that Kies knew or suspected that failing to follow the accommodations would exacerbate Osterman's heart condition. Osterman has not shown that Kies "knowingly exposed [him] to a substantial danger to his health for no good reason." *Cf. Egebergh v. Nicholson*, 272 F.3d 925, 928 (7th Cir. 2001) (holding that jury could infer deliberate indifference where defendants knew that depriving diabetic plaintiff of insulin would endanger his health). Once Osterman began experiencing chest pains, Kies immediately contacted Nurse Klenke, who treated his heart condition with nitroglycerin. For these reasons, Kies was not deliberately indifferent to Osterman's serious medical needs.

Osterman has also failed to show that Beier and Wesner were deliberately indifferent to his medical needs. After Osterman received treatment for his heart condition, Beier worked with Osterman and Wesner to devise a modified accommodation so that Osterman could provide a sample in the intake room. Osterman agreed to the modified special accommodations and provided

7

a sample. In short, Beier and Wesner were not deliberately indifferent to his medical needs relative to his need for a privacy accommodation. Therefore, Defendants' motion for summary judgment will be granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 20) is **GRANTED**. The Clerk is directed to enter judgment dismissing this case with prejudice.

**SO ORDERED** this  9th  day of May, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court